# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00510-CR
## NO. 03-10-00511-CR

**Bart Lindsey Vaughn, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE COUNTY COURT AT LAW NO. 2 OF BELL COUNTY
## NOS. 2C10-03095, 2C10-03096, HONORABLE JOHN MISCHTIAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Bart Lindsey Vaughn of assault of a family or household member with bodily injury and interference with an emergency telephone call. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West 2003), § 42.062(a) (West Supp. 2010). The trial court assessed punishment at 180 days in jail and a $100 fine for the conviction for assault with bodily injury and 180 days and a $100 fine for the conviction for interference with an emergency call. Vaughn raises three issues on appeal, asserting that: (1) the trial court erred in denying his request for a self-defense instruction in the jury charge; (2) the trial court erred in admitting extraneous-offense evidence; and (3) the evidence is insufficient to support his conviction for interference with an emergency telephone call. Because we conclude that the trial court did not err or that any error was harmless, we affirm the trial court's judgments.

# BACKGROUND

The trial record shows that on April 1, 2010, Bart Vaughn and his ex-wife Jolene Vaughn ("Jolene") became involved in a dispute with each other at the home in which they both lived in Harker Heights. Vaughn and Jolene have two sons who were living with them and were present during some of the dispute. At the time of trial, the elder son ("Robert") was sixteen years of age and the younger son ("John") was ten years of age.[1] Jolene, Robert, John, and several witnesses testified at trial regarding the events that occurred on the day of the dispute and the details of the dispute. Regarding the events leading up to the dispute, Jolene testified that Vaughn began drinking beer in the morning on the day of the dispute. She testified that Vaughn left the house at 10:00 a.m. and then returned with a friend at about 11:30 a.m. According to her, Vaughn and his friend had a bottle of whiskey. She testified that Vaughn became more and more drunk throughout the day, and she suspected that he was drinking the whiskey.[2] Jolene testified that she had "a couple of beers" after Vaughn began drinking on the morning of the dispute. According to her testimony, she had "about one and a half beers" throughout the day.

On the day of the altercation, Robert was at home with three of his friends ("Jason," "Lisa," and "Matt"). At some point during the day, Robert and his friends left the house to go somewhere else.[3] After they left, Jolene and Vaughn began arguing. Jolene testified that the

---

[1] Because we wish to protect the identity of minors, and because there were several minors who testified at trial in this case (making the use of initials confusing), we will use fictitious given names when referring to the minors involved in this case.

[2] Other witnesses also testified that they saw Vaughn drinking alcohol that day.

[3] There is a great deal of variation among the testimony of Robert and his friends. In this instance, Robert and Matt testified that the group went to a friend's house. Lisa and Jason testified that the group went to the store.

argument began when Vaughn told her that he wanted to drive to his brother's house, and she told him she did not think he should drive. According to her testimony, she did not want him to drive because he had been drinking and because he had illegal tags on his truck. Jolene testified that she attempted to stop him from leaving by taking his keys out of the ignition of his truck and throwing them across the yard. She testified that Vaughn then hit her in the face with a closed fist and called her vulgar names. According to her testimony, Vaughn continued hitting her as the two of them moved toward the porch. She testified that he also pulled a knife out of his back pocket, opened it, and came at her with it, saying, "I'll fix you, bitch." She testified that he then tripped over a cross-tie that separated the front yard from the driveway, causing him to drop the knife. According to her, she ran and picked up the knife and then stabbed it into the back tire of his truck, trying to break the blade off. She testified that Vaughn called her a "stupid bitch" and then began hitting her again.

Jolene testified that while Vaughn was hitting her, she told him that "if he didn't back off, that [she] was going to call the police." She testified that Vaughn said, "No, you're not, bitch." According to her, Vaughn then grabbed the hand in which she held the phone and bent it back so far that she dropped the phone. She testified that after the phone dropped, Vaughn "went to try to stomp on it." Jolene testified that she was unsure whether Vaughn actually stomped on the phone because she was busy trying to protect herself from his punches.

Jolene testified that at some point during the fight, she noticed that John (her and Vaughn's ten-year-old son) was there. She stated that John was crying and saying, "Daddy, stop; Daddy, stop." Jolene testified that John first tried to go pick up the phone that had fallen to the ground, but then, upon seeing Vaughn continue to hit Jolene, picked up a plastic plumbing pipe and

3

hit his father in the back of the head with it. According to Jolene, Vaughn then turned around and slapped John across the face with an open hand before turning back to hit her again. She testified that John was shocked and that he crumpled to the ground, crying. Jolene testified that she and John then started moving toward the porch, and she asked John to try to put the phone back together again, which he did. When the phone was back together, she asked John to call Robert, and she then got on the phone and asked Robert to come home.

In a short time, Robert arrived at the house with Jason, Matt, and Lisa. Jolene testified that Vaughn was hitting her on the porch when Robert and his friends arrived. She testified that Robert and his friends ran up to the porch and pulled Vaughn away from her. According to Jolene's testimony, Robert then had a verbal confrontation with Vaughn. Robert and his friends stayed between Vaughn and Jolene, and Jolene called Robert's girlfriend and asked if she and her parents could come pick Jolene and her sons up from the house, which they did. Jolene testified that she did not try to call 9-1-1 again because she "just wanted to get [herself] and [her] kids out of there." Jolene went to the police station to report the incident five days later, on April 6, 2010. There, a detective took photos of Jolene's injuries. The photos show a black eye and injuries to one of Jolene's hands.

John also testified regarding the dispute. He testified that he first went outside when he heard his mother and father arguing on the porch. He testified that his mother did not want his father to leave because his father had been drinking whiskey and beer. According to John, his parents were "arguing and yelling back and forth" using "bad swear words," and his mother took his father's keys out of the truck and threw them into the garden. John testified that his father became

4

angry and started hitting his mother in the face. He testified that his father took a knife out of his back pocket and went toward his mother with it. According to John, his mother knocked the knife out of his father's hand, and the knife fell to the ground. John testified that his mother then stabbed the truck tire with the knife. John testified that his father hit his mother five times after his mother stabbed the truck tire. During this time, his mother tossed her phone to him and told him to call 9-1-1, but he was not able to catch the phone. John testified that when the phone fell to the ground, his father "stomped it," causing it to break in half. After that, his father continued hitting his mother. John testified that he picked up a little white pipe and hit his father in the back of the head and neck with it. He testified that his father turned around and hit him in the chin with the palm of his hand. After that, John went back inside the house. He testified that he heard "more ruckus" outside on the porch and saw his mother throw a tire tool at his father's legs. At that point, Robert and his friends arrived and stepped in between Vaughn and Jolene. John testified that his mother's thumb was swollen and bruised, and her lip and nose were bleeding.[4]

---

[4] During cross-examination, John testified that he saw his mother hit his father more than one time. However, the wording of the questions he was asked about the issue make it unclear whether he was speaking of his mother or his father as the one doing the hitting. The exchange occurred as follows:

Defense:    Did you see your dad hit your mom?

John:       Yes, ma'am.

Defense:    Did you see her hit him many, many times?

John:       She didn't hit him. It was—

Defense:    Or more than one time?

John:       Yes, ma'am.

Robert testified that when he arrived back home after his mother called him, his father was fixing the tire on his truck. He testified that he saw his mother and John come out of the house, and they were both crying. John's jaw was bruised and swollen, and his mother had a black eye. Robert testified that he and his father had a verbal confrontation and then Robert stood in front of his mother and John to protect them. Robert then went to the other side of the house with his friends to calm down, and he heard a "pop" and then his mother screaming. When Robert returned to the other side of the house, he saw his father hitting his mother. Robert testified that his father pointed at his mother and hit her in the mouth, causing her mouth to start bleeding. Robert stated that his father made contact with his mother's mouth and jaw and that he hit her about four times. At that point, Robert saw his mother hit his father on the cheek about two times. He testified that when he saw his mother swinging, he thought "she was trying to defend herself because [Vaughn] was messed up and he was losing his temper." Robert stood in between his parents, and he asked Lisa to hold his mother back. Robert also testified that his mother picked up a tire tool "for her defense" at some point during the altercation.

Lisa testified regarding what she witnessed when she, Robert, and other friends returned to the house. Lisa testified that she saw Jolene come out of the house with blood on her mouth, and that Jolene told her that Vaughn had hit her and her son. Both Jolene and John were crying. Lisa testified that Jolene went inside to gather some of her things, but that when she went back outside, "she started yelling, and [she and Vaughn] got into it again." Lisa testified that Jolene and Vaughn yelled at each other. Lisa testified that she tried to calm Jolene down, but Jolene said, "no, no. This isn't right," and that she was "going to get back at him for the things that [he had]

6

done to [her]." Eventually, Jolene calmed down, and Lisa called the police. Lisa testified that after she got off of the phone, Jolene went back toward Vaughn and started screaming again. According to Lisa's testimony, Vaughn then slapped Jolene across the face. Lisa testified that she saw Jolene push Vaughn "once or twice," but that she never saw Jolene hit him in the face. Lisa testified that Jolene and her two sons eventually left, and the police arrived about twenty or thirty minutes later.

Jason testified that when he, Robert, and their other friends got back to the house, he saw Vaughn jumping into his truck and Jolene on the porch yelling. Jason testified that he got into the truck with Vaughn, tried to calm him down, and gave him more whiskey. Jason testified that Vaughn got out of the truck, and Jason took the truck keys and gave them to Jolene because he did not think Vaughn should be driving. Jason saw Vaughn and Jolene arguing and testified that "a few blows were exchanged." He testified that Jolene spit in Vaughn's face and then Vaughn "smack[ed]" Jolene. He testified that Jolene then "smack[ed]" Vaughn back and added that it was "probably for self-defense or something." According to Jason's testimony, Jolene grabbed a tire tool, and he and the others took it from her and separated her and Vaughn. Jason testified that he and Robert went to the other side of the house so that Robert could calm down, and they heard a "big scream." When they got to the other side of the house, Jason saw Vaughn and Jolene "fist fighting again." He testified that they were both punching each other at the same time. He, Robert, and their other friends separated Jolene and Vaughn, and Jolene called someone for a ride and then left with Robert and John. Jason testified that Vaughn called the police, and the police arrived some time later.

7

Robert's friend Matt testified that when he, Robert, and their friends got back to the house, he saw Vaughn putting a spare tire on his truck, Jolene and John crying and screaming, and Jolene swearing at Vaughn. Matt testified that Vaughn went onto the porch and began arguing with Jolene and Robert. According to Matt's testimony, Vaughn swore at Jolene, and Jolene swore back, and then Vaughn "socked [Jolene] in the face." Matt testified that he thought that the first hit was with a fist and that then there were several with an open hand. He testified that Jolene punched Vaughn in the lip area. Eventually, Robert held Vaughn back and Lisa held Jolene back. Jason testified that Jolene had a bloody nose, "busted lips . . . in like 12 different places, [and] blood leaking all down her face." He testified that Vaughn had a "bloody gum," and John had a bruised jaw. Jason testified that Jolene, Robert, and John eventually left, and Vaughn called the police, who later arrived on the scene.

Shana Fenton, who lived next door to Jolene and Vaughn, testified that she worked the night shift on the evening of April 1, 2010. She testified that before her shift, she awoke to the sounds of squealing tires and yelling at Jolene and Vaughn's house. She testified that she looked out the window and saw Vaughn, Jolene, and their children "hollering back and forth at one another." Fenton walked away from the window and turned her television up loud to block the noise of the argument. At some point later, Fenton went back to the window and saw Jolene slapping Vaughn while the two of them were on the porch. Fenton testified that Jolene was "just constantly back and forth slapping him" and that Jolene slapped Vaughn about three or four times. Fenton testified that she did not see Vaughn strike Jolene. According to Fenton's testimony, Robert had to hold both of Jolene's arms back to keep her from Vaughn. Fenton testified that Vaughn was

standing back in the corner of the porch and that he was not being held back. After that, Fenton returned to watching television. She heard more yelling, and then later, her husband arrived home and told her that the police were at Vaughn and Jolene's house.

Fenton's husband, John Phillips, testified about previous observations he had made of Vaughn and Jolene. He testified that he had previously seen "[a] lot of screaming by Jolene," and that he had seen Jolene be "very aggressive" toward Vaughn. Phillips testified that he had seen Jolene slap Vaughn on the chest. He testified that he had never seen Vaughn strike Jolene or raise his voice to her. Phillips also testified that about three or four weeks before the April 1 dispute, he saw another dispute between Vaughn and Jolene during which he observed Jolene yell at Vaughn and then walk quickly toward him as though she were going to hit him and then stop and keep yelling. Phillips testified that Vaughn did not respond to Jolene and went back to working on his truck.

After all the evidence was presented at trial, the jury convicted Vaughn of assault of a family or household member with bodily injury and interference with an emergency telephone call. After a sentencing hearing, the trial court assessed punishment at 180 days in jail and a $100 fine for the conviction for assault with bodily injury and 180 days and a $100 fine for the conviction for interference with an emergency call. This appeal followed.

## DISCUSSION

In three issues, Vaughn challenges: (1) the trial court's denial of his request for a self-defense instruction in the jury charge; (2) the trial court's admission of extraneous-offense evidence;

9

and (3) the sufficiency of the evidence supporting his conviction for interference with an emergency telephone call. We address each issue in turn.

### Self-Defense Instruction

Vaughn contends that the trial court erred in denying his request for a self-defense instruction in the jury charge, asserting that the self-defense issue was raised by the evidence presented at trial. When a party claims that there is a jury-charge error, the first step is to determine whether there is indeed error in the charge. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). Then, if there was error and the appellant objected to the error at trial, we must reverse if the error is calculated to injure the rights of the defendant. *Id*. In other words, we must reverse if the error has caused "some harm" to the defendant. *Id*. We use an abuse of discretion standard in reviewing a trial court's decision to refuse a jury instruction. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules and principles. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241-42 (Tex. 1985).

A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak and regardless of what the trial court may think about the credibility of the defense. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). We view the evidence in the light most favorable to the defendant in determining whether there is some evidence to support the claim. *Id*. "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657-58

10

(Tex. Crim. App. 2007). If the record does not reflect any evidence of an appellant's state of mind or observable manifestations of an appellant's state of mind, then the appellant is not entitled to a jury instruction on the issue of self-defense. *See Reed v. State*, 703 S.W.2d 380, 385 (Tex. App.—Dallas 1986, pet. ref'd). Self-defense is rarely raised when the defendant does not testify, but a defendant need not testify in order to raise the issue. *See Smith v. State*, 676 S.W.2d 584, 585, 587 (Tex. Crim. App. 1984); *Lavern v. State*, 48 S.W.3d 356, 360 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Shelvin v. State*, 884 S.W.2d 874, 878 (Tex. App.—Austin 1994, pet. ref'd).

The elements of a self-defense claim are set forth in Section 9.31 of the Texas Penal Code, which states, in relevant part:

> [A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:
>
> . . . .
>
> (2) did not provoke the person against whom the force was used; and
>
> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code Ann. § 9.31 (West Supp. 2010). Based on section 9.31, the court of criminal appeals has stated that "in order to justify the submission of a charge to the jury on the issue of self-defense, there must be some evidence in the record to show that the defendant was in some

11

apprehension or fear of being the recipient of the unlawful use of force from the complainant." *Smith*, 676 S.W.2d at 585.

Here, the record is devoid of evidence that Vaughn reasonably believed that force was immediately necessary to protect himself against Jolene's unlawful force or that Vaughn was in apprehension or fear of being the recipient of Jolene's unlawful force. To begin with, evidence of the beginning of the altercation, which was admitted through the testimony of Jolene and John, shows that Vaughn was the aggressor. Specifically, Jolene testified that the first blow occurred when Vaughn hit her in the face with a closed fist after she took his keys out of the ignition of his truck and threw them across the yard in an attempt to stop him from leaving the house. John testified consistently with Jolene, stating that Vaughn became angry and started hitting Jolene in the face after Jolene took Vaughn's keys out of his truck and threw them into the garden.

A self-defense instruction is inappropriate where the state of the evidence suggests that the appellant initiated the altercation. *See* Tex. Penal Code Ann. § 9.31(b)(1), (4) (use of force not justified in response to verbal provocation alone or if defendant provoked other's use of force and did not abandon or attempt to abandon encounter); *Smith v. State*, 965 S.W.2d 509, 512-13 (Tex. Crim. App. 1998) (defendant may not claim self defense if he provokes attack seeking excuse to injure other party); *Lockhart v. State*, 847 S.W.2d 568, 574-75 (Tex. Crim. App. 1992) (no error in omitting self-defense instruction where appellant initiated altercation and there was no evidence that he attempted to abandon encounter); *Kennedy v. State*, 193 S.W.3d 645, 654 (Tex. App.—Fort Worth 2006, pet. ref'd) ("Provoking the use of force acts as a limitation or total bar on a defendant's right to self-defense.").

In addition to the evidence that Vaughn initiated the altercation, there is also no evidence showing that Vaughn was in apprehension or fear of being the recipient of unlawful use of force from Jolene when he began hitting Jolene and no evidence showing any observable manifestations of Vaughn's alleged belief that he needed to hit Jolene in order to prevent her from using unlawful force against him.[5] *See Smith*, 676 S.W.2d at 585; *Reed*, 703 S.W.2d at 385.

Vaughn points to evidence of Jolene's actions after the initiation of the altercation and argues that those actions raised the issue of self-defense. Specifically, Vaughn refers to evidence that Jolene stabbed his truck tire with a knife, threw a tire iron at him, hit him, and had to be held back. However, none of the evidence referenced by Vaughn supports a conclusion that Vaughn would have thought that hitting Jolene was "immediately necessary" or shows that Vaughn was in apprehension or fear of being the recipient of unlawful force from Jolene. Jolene testified that Vaughn had already hit her in the face with a closed fist, continued hitting her, and approached her with a knife before any of the other events occurred. John's testimony was consistent with Jolene's. He testified that the violence began when Vaughn became angry, started hitting Jolene in the face, and went toward Jolene with a knife. When Jolene took possession of the knife after Vaughn either dropped it or she took it from him, she stabbed the knife into Vaughn's truck tire. According to the testimony of Jolene and John, Vaughn reacted by hitting Jolene again. That is not evidence showing apprehension or fear on the part of Vaughn. There is no evidence that Jolene threatened him with

_____

[5]  Evidence that Vaughn went so far as to pull a knife on Jolene when there is no evidence that Jolene had a weapon or threatened Vaughn with a weapon provides further support for the conclusion that Vaughn's violent actions were not the result of his apprehension or fear.

13

the knife or went toward him with the knife. To the contrary, Jolene testified that she stabbed the knife in the tire in order to prevent Vaughn from drunk driving and from using the knife to harm her.

Even evidence showing that Jolene hit Vaughn at a point at which Vaughn was not hitting her does not show apprehension or fear on the part of Vaughn. Fenton (Vaughn and Jolene's neighbor) testified that she observed Jolene slapping Vaughn about three or four times while Jolene and Vaughn stood on the porch of their home. Fenton testified that she did not see Vaughn strike Jolene. According to Fenton's testimony, Robert had to hold both of Jolene's arms back to keep her from Vaughn. Fenton testified that Vaughn was standing back in the corner of the porch and that he was not being held back. Fenton's testimony that Jolene had to be held back from Vaughn did not include testimony that Vaughn appeared apprehensive or afraid of Jolene. Rather, Fenton stated only that Vaughn was "[s]tanding back in the corner of the porch" while Jolene was being held back, not that he was moving away or otherwise appearing fearful.

Further, testimony presented at trial showed that violence exhibited by Jolene was in self-defense. For example, Robert testified that Jolene picked up a tire tool "for her defense." More specifically, the following exchange occurred during Robert's testimony:

State:      Did anybody ever try to pick up a tire tool?

Robert:     Yes, my mom did for her defense because [Vaughn] was really trying to beat her. And she grabbed something to defend herself because she really can't defend herself very well.

State:      Is your father bigger than your mother?

Robert:     Yes, he is.

14

Robert also testified that he saw Jolene hit Vaughn on the cheek about two times and that he thought "[Jolene] was trying to defend herself because [Vaughn] was messed up and he was losing his temper and couldn't control his temper, and he was taking all of his temper out on her, and she was trying to defend herself and get him to stop." According to Robert, he also heard Jolene yelling at Vaughn, "telling [Vaughn] to stop." In other testimony, Jason testified that he saw Jolene hit Vaughn after Vaughn hit her and that Jolene's striking of Vaughn was "probably for self-defense or something." Thus, none of the evidence suggests that Jolene's actions caused fear or apprehension on the part of Vaughn or that Vaughn would have thought that harming Jolene was "immediately necessary."

In another part of his argument, Vaughn points to evidence of Jolene's aggression on previous occasions—which was presented through the testimony of John Phillips (Vaughn and Jolene's neighbor)—and contends that it raises evidence that Vaughn was acting in self-defense when he hit Jolene on April 1. Phillips testified that on occasions before the date of the altercation, he had seen "[a] lot of screaming by Jolene," and that he had seen Jolene be "very aggressive" toward Vaughn. Phillips testified that he had seen Jolene slap Vaughn on the chest. He testified that after Jolene slapped Vaughn, Vaughn "just kind of stood there and looked at her." Phillips testified that he had never seen Vaughn strike Jolene or raise his voice to her. Phillips also testified that about three or four weeks before the April 1 dispute, he saw another dispute between Vaughn and Jolene during which he observed Jolene yell at Vaughn and then walk quickly toward him as though she were going to hit him. Phillips testified that Vaughn did not respond to Jolene and went back to

15

working on his truck. Phillips acknowledged that he did not see what happened between Jolene and Vaughn on the day of the April 1 dispute.

Phillips's testimony does not raise the issue of self-defense because evidence of Jolene's aggression on dates previous to the date of the dispute at issue does not show that Vaughn would have thought it "immediately necessary" to hit Jolene numerous times on the day of the April 1 dispute. *See* Tex. Penal Code Ann. § 9.31; *Smith v. State*, 638 S.W.2d 208, 210 (Tex. App.—Fort Worth 1982, no pet.) (no self-defense instruction even though complainant threatened defendant on previous occasions because force could not have reasonably been believed to be "immediately necessary" to protect defendant against complainant). Evidence of previous aggressive encounters between Jolene and Vaughn also does not supply the required element of apprehension or fear on the part of Vaughn on the day of the dispute. *See Smith*, 676 S.W.2d at 585. There is simply no evidence showing that Vaughn experienced fear or apprehension during the April 1 altercation.

Because there is no evidence in the record raising the issue of self-defense, we conclude that the trial court did not abuse its discretion in denying Vaughn's self-defense instruction. *Shaw*, 243 S.W.3d at 657-58; *Ferrel*, 55 S.W.3d at 591. We therefore overrule Vaughn's first issue.

### *Extraneous-Offense Evidence*

Vaughn contends that the trial court erred in admitting testimony describing acts of extraneous misconduct that occurred two days after the date of the altercation. The evidence admitted over Vaughn's objection was the testimony of Jolene, in which she spoke of an incident that occurred between her and Vaughn when she went back to the house to collect clothing for her and her children on April 3, 2010, two days after the April 1 altercation. Jolene testified that Vaughn

16

showed up at the house with a friend after she arrived there. She testified that Vaughn and his friend came through the front door and forced her back into the house by walking toward her. She testified that they forced her into a side bedroom. According to her testimony, Vaughn then pulled out a pocket knife and used it to cut her t-shirt in the front of the shirt from the top of the shirt to the bottom. She testified that Vaughn said, "I'll fix you, bitch," while he cut her shirt. She testified that the blade caused scratches on her chest. According to her testimony, she managed to get away from Vaughn and his friend and out the front door.

Jolene also testified that after the shirt-cutting incident, she received threatening phone calls and text messages from Vaughn telling her that she "need[ed] to return his truck keys . . . or he'd be forced to come and get them himself, no matter what it took." Jolene testified that she went to the police station on April 6 to report the April 1 and April 3 incidents. She further testified that it was the combination of all of Vaughn's abusive and threatening behavior that caused her to go to the police on April 6.

We review trial court rulings on the admissibility of evidence for abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). A trial court abuses its discretion in an admissibility ruling when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if its decision is within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). A trial court's ruling is generally within the zone of reasonable disagreement if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice,

17

confusion of the issues, or misleading of the jury. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *see* Tex. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith . . . ."). Before evidence of extraneous offenses may be admitted, the proponent of the evidence must explain precisely how the evidence is probative of a fact of consequence. *See Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996).

Here, the State asserted in the trial court that Jolene's testimony about Vaughn's extraneous acts of misconduct was admissible because the defense attorney opened the door to the issue when she cross-examined Jolene about why Jolene did not call the police or go to the police station on the night of April 1, the date of the altercation. The portions of the cross-examination that the State referred to included the following:

Defense: And when you got hold of a cell phone [on April 1], you did not call 9-1-1?

Jolene: No.

Defense: You called a friend to come get you?

Jolene: Yes.

Defense: You did not go to the police right away?

Jolene: No.

Defense: Ma'am, this allegedly occurred on Elbert Lane, right?

Jolene: Yes, ma'am.

Defense: Approximately how far is Elbert Lane from the police station?

Jolene:        I guess approximately maybe two or three blocks.

Defense:       Two or three blocks?

Jolene:        Something like that.

Defense:       And you did not have your friends take you to the police station?

Jolene:        No.

                                    . . . .

Defense:       And after you left [on April 1], you never called 9-1-1 either?

Jolene:        No.

At that point in the testimony, the State asked to approach the bench, and the following exchange

occurred:

State:         Your Honor, the defense cross-examined [Jolene]. [Defense counsel]
               said, you didn't call 9-1-1; you didn't call the police; how far is it
               from that house to the police station, to try to make it look as if this
               person didn't call the police, made a conscious decision not to call the
               police. There was an event in between . . . April 1 and April [6] that
               frightened her so much that she decided it was time to actually call
               the police. To leave it out makes it look like this individual wasn't
               that seriously hurt, wasn't afraid, and was overreacting. To leave it
               out doesn't create the complete picture as to why this [individual]
               finally had enough and went to the police on April 5.

Defense:       Your Honor, my answer to that—I'm talking about her state of mind
               on April 1. She's testified as to why she went—she got in—to me,
               that's my answer to why she went. But actually, I'm concentrating on
               April 1. All of this I've asked her about was April 1. What
               she—what she's trying to get in is a different offense on a different
               day that had not occurred. I'm looking at her state of mind on April
               1. Her state of mind on April 1 was not, tomorrow I'm going to be
               assaulted. I'm talking about what her state of mind was at the time
               of the alleged offense. And it would be highly prejudicial to let

19

>some—something that happened the next day . . . come in to prove why she didn't do something the day before. That's illogical.

. . . .

State: But you opened the door when you exposed the fact, you didn't call the police; you didn't call the police; you didn't call the police; you could have; you should have. And one of the major reasons she finally decided she had to was because of that contact—

. . . .

Defense: I'm talking about her state of mind on April 1. What happens after April 1 has absolutely nothing to do with her state of mind on April 1. What happens tomorrow has nothing to do with my state of mind today.

State: Then the State's not able to explain why she went to the police.

Defense: That's not the point. You can explain why she didn't go that day. I'm happy for her to bring things in, why did you not come in on—why did you not go [on] April 1. That's what I'm talking about. But to let something else come in that happened after that does not go to her state of mind on April 1, Your Honor. And it's a highly prejudicial extraneous offense that has nothing to do with what's going on, and brings in a whole other matter.

After hearing the arguments from counsel, the trial judge admitted the testimony, stating that the defense had opened the door to it.

Considering the record, we agree with defense counsel's arguments. As previously stated, the extraneous transaction must be relevant to a material issue, *see De La Paz*, 279 S.W.3d at 344, and the proponent of the evidence must explain precisely how the evidence is probative. *See Segundo*, 270 S.W.3d at 88 n.19. Here, even assuming that Jolene's decision not to go to the police on April 1 was a material issue, the alleged assault that occurred two days later was not probative

20

of that issue. Regardless of what occurred in the days after the April 1 altercation, Jolene did not go to the police on April 1. It was that decision—not Jolene's later decision to go to the police—that defense counsel was probing during cross-examination. Because evidence of extraneous misconduct on the part of Vaughn after the April 1 altercation is not probative of Jolene's decision not to go to the police on April 1, and because the issue of Jolene's delay in going to the police was the only reason given by the trial court for the admission of the evidence, we conclude that the trial court erred in admitting the evidence.

Having concluded that the trial court erred, we must now determine whether the error was harmful. The erroneous admission of evidence of an extraneous offense is nonconstitutional error. *Roethel v. State*, 80 S.W.3d 276, 281 (Tex. App.—Austin 2002, no pet.); *Johnson v. State*, 84 S.W.3d 726, 729 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Accordingly, we must disregard the error unless it affects Vaughn's substantial rights. *See* Tex. R. App. P. 44.2(b); *Roethel*, 80 S.W.3d at 281. A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *See Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Our review of the entire record includes reviewing any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the alleged error might be considered in connection with the other evidence in the case. *Id*. We may also consider the jury instructions, the State's theory and any

21

defensive theories, whether the State emphasized the error, closing arguments, and voir dire, if applicable. *Id*. at 355-56.

Here, the State presented considerable evidence of Vaughn's guilt. Numerous witnesses—including Jolene, her sixteen-year-old son Robert, her ten-year-old son John, and Robert's friends Lisa, Jason, and Matt— testified that they saw Vaughn hit Jolene. Several of them testified that they saw Vaughn strike Jolene multiple times. Some of the witnesses also testified that any acts of violence from Jolene appeared to be in self-defense. For example, Robert testified that his mother picked up a tire tool "for her defense" and that when Robert saw his mother hitting Vaughn with her hand, he thought "she was trying to defend herself because [Vaughn] was messed up and he was losing his temper." Jason testified that he saw Jolene "smack" Vaughn in response to Vaughn hitting her, and that Jolene's decision to hit Vaughn was "probably for self-defense or something."

Further, there was considerable evidence of injuries to Jolene. John testified that Jolene's thumb was swollen and bruised, and her lip and nose were bleeding as a result of the altercation. Robert testified that when he arrived home after the altercation began, he saw Jolene and John come out of the house crying and noticed that Jolene had a black eye. Robert also testified that he saw Vaughn hit Jolene in the mouth, causing her mouth to bleed. Lisa testified that she saw Jolene come out of the house with blood on her mouth and that she observed both Jolene and John crying. Jason testified that Jolene had a bloody nose, "busted lips . . . in like 12 different places, [and] blood leaking all down her face." When Jolene went to the police station five days after the altercation, a detective took photos of Jolene's injuries, which included a black eye and injuries to one of her hands.

22

In addition, the State did not reemphasize the details of the extraneous offense during closing argument. At closing argument, the State made only general mention of Jolene's delayed decision to go to the police, stating:

> This is a woman [Jolene] who did not want [Vaughn] to get . . . in trouble. She desperately didn't want to get him in trouble. She didn't even call the police on the first, the second, the third or the fourth [day]. She didn't call the police until she absolutely had to to keep her family safe. That was a very reasonable thing for a woman to do.
>
> . . . .
>
> She didn't want to call the police. She didn't want to get him in trouble. She only did so when she felt she was threatened.

Finally, the record shows that the trial court included a limiting instruction in the jury charge, stating:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the information in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the state of mind of the victim in connection with the offense, if any, alleged against him in the information in this case, and for no other purpose.

Absent evidence to the contrary, which is not present here, the jury is presumed to follow the instructions given in the court's charge. *See Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996).

Considering the record in its entirety, we conclude that the error in admitting evidence of the extraneous misconduct did not have a substantial and injurious effect or influence on the jury's verdict and thus did not affect Vaughn's substantial rights. *See Casey*, 215 S.W.3d at 885; *King*,

23

953 S.W.2d at 271. Accordingly, we hold that the error is harmless and should be disregarded. *See* Tex. R. App. P. 44.2(b); *Roethel*, 80 S.W.3d at 281.

### *Sufficiency of Evidence*

Vaughn argues that the evidence is insufficient to support his conviction for interference with an emergency telephone call. In reviewing the sufficiency of the evidence to support a conviction, we view all evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *see Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The trier of fact is the sole judge of the weight and credibility of the evidence, and we may not substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must presume that the factfinder resolved any conflicting inferences in favor of the conviction. *Jackson*, 443 U.S. at 326.

An individual commits the offense of interference with an emergency telephone call if he "knowingly prevents or interferes with another individual's ability to place an emergency telephone call or to request assistance in an emergency from a law enforcement agency, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals." Tex. Penal Code Ann. § 42.062(a). The statutory definition of "emergency" is "a condition or circumstance in which any individual is or is reasonably believed by the individual making a telephone call to be in fear of imminent assault or in which property is or is reasonably believed by the individual making the telephone call to be in imminent danger of damage or destruction." *Id*. § 42.062(d). An individual commits an assault if he "intentionally, knowingly, or

24

recklessly causes bodily injury to another . . . [or] intentionally or knowingly threatens another with imminent bodily injury." *Id*. § 22.01(a)(1), (2).

Here, the evidence regarding an attempt to make an emergency call was admitted through the testimony of Jolene and John. Jolene testified that Vaughn was hitting her, and she told him that "if he didn't back off, that [she] was going to call the police." She testified that Vaughn said, "[N]o, you're not, bitch." According to her, Vaughn then grabbed the hand in which she held the phone and bent it back so far that she dropped the phone. She testified that after the phone dropped, Vaughn "went to try to stomp on it." She testified that she was unsure whether Vaughn actually stomped on the phone because she was busy trying to protect herself from his punches. Jolene testified that after Vaughn continued hitting her and hit John, she and John started moving toward the porch. By then, the phone had broken apart, and according to Jolene, she then asked John to try to put the phone back together again, which he did. When the phone was back together, she asked John to call Robert, and she then got on the phone and asked Robert to come home.

John testified that while Vaughn was hitting Jolene, Jolene tossed the phone to John and told him to call 9-1-1. John testified that he was not able to catch the phone. According to John, when the phone fell to the ground, Vaughn "stomped it," causing it to break in half. John testified that after stomping the phone, Vaughn continued hitting Jolene.

In Vaughn's argument regarding this issue, he points out the discrepancy between Jolene and John's testimony—specifically, Jolene's testimony that Vaughn caused her to drop the phone and John's testimony that Jolene tossed the phone to John—and contends that if the jury believed Jolene's version, then there was no evidence that Jolene attempted to dial 9-1-1, and if the jury believed John's version, then there was no evidence that Vaughn prevented or interfered with

25

Jolene's ability to call 9-1-1 because Vaughn would have been interfering with John's ability to make a call, not Jolene's. Regarding Vaughn's argument that Jolene's version of events resulted in insufficient evidence, Vaughn does not cite, and we have not found, any authority for the proposition that there must be evidence that a victim was actually attempting to dial 9-1-1 in order to convict a defendant of interference with an emergency call. The statute requires only that a defendant knowingly prevent or interfere with another individual's *ability* to place an emergency telephone call. *See id*. § 42.062(a). Whether Vaughn bent back Jolene's hand, causing her to drop the phone, or Jolene had to throw the phone to John and ask him to call 9-1-1 because she was being hit by Vaughn, the jury could have rationally concluded that the evidence showed that Vaughn interfered with Jolene's ability to call 9-1-1.

Regarding Vaughn's argument that John's version of events resulted in insufficient evidence, Vaughn argues that evidence that he stomped on the phone after the phone was thrown to John would show only that he interfered with John's ability to make an emergency phone call, not Jolene's ability to do so. He contends that the State would have needed to name John as the victim in the indictment, not Jolene. But Vaughn does not cite, and we have not found, any authority supporting his argument. In addition, even if the jury believed that Jolene threw the phone to John and told him to call 9-1-1, there was still evidence that Vaughn interfered with Jolene's ability to make the call because there was evidence that Vaughn was hitting Jolene at the time, thus causing her to have to throw the phone to John, and that Vaughn then stomped on the phone after it was thrown.

Further, Vaughn's argument assumes that the jury had to believe *all* of Jolene's testimony about the 9-1-1 call or *all* of John's testimony. However, a factfinder is entitled to accept

26

one portion of a witness's testimony and reject another portion. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *In re C.M.G.*, 180 S.W.3d 836, 839 (Tex. App.—Texarkana 2005, pet. denied). Given the evidence that Vaughn was hitting Jolene at the time the phone ended up on the ground, and given the generally chaotic nature of the incident, including yelling, violence, and derogatory language, the jury could have reasonably inferred that John thought Jolene threw him the phone when in fact she dropped it or that Jolene could have been mistaken when she remembered dropping the phone. In any case, it is the responsibility of the factfinder to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences, and we must presume that the jury resolved any conflicting inferences in favor of the conviction. *Jackson*, 443 U.S. at 319, 326.

Considering all of the evidence regarding Jolene's attempt to make an emergency phone call—that Vaughn was hitting Jolene before and after the phone was involved; that Vaughn said, "No, you're not, bitch," when Jolene told him she was going to call the police if he did not back away; that the phone ended up on the ground, whether from Vaughn bending Jolene's hand back or from Jolene having to throw the phone to John; and that Vaughn "went to try to stomp on it" or actually did stomp on it, breaking it apart—we conclude that a rational trier of fact could have found the essential elements of the crime of interference with an emergency telephone call beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318-19; *Brooks*, 323 S.W.3d at 895. Accordingly, we hold that the evidence is sufficient to support the conviction, and we overrule this issue.

## CONCLUSION

Given our determinations that the trial court did not err in denying Vaughn's request for a self-defense instruction, that any error in the admission of evidence of extraneous misconduct

27

was harmless, and that the evidence is sufficient to support Vaughn's conviction for interference with an emergency telephone call, we affirm the trial court's judgments.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   July 1, 2011

Do Not Publish